**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
CHRISTIAN BEY :
:
Appellant : No. 893 WDA 2023

Appeal from the Judgment of Sentence Entered July 10, 2023
In the Court of Common Pleas of Allegheny County
Criminal Division at No:  CP-02-CR-0007905-2019

BEFORE:  BOWES, J., STABILE, J., and BENDER, P.J.E.

MEMORANDUM BY STABILE, J.:　　　　　**FILED:  December 22, 2025**

Appellant, Christian Bey, appeals from his judgment of sentence of life imprisonment without the possibility of parole for first-degree murder. Although Appellant raises a plethora of arguments, we find none have merit. Accordingly, we affirm.

On July 14, 2019, Calvin Hall, an off-duty Pittsburgh police officer, was shot during a block party near 7331 Monticello Street in Homewood, Pennsylvania.  Hall died three days later.  The facts relating to this killing are as follows.

On the evening of July 13, 2019, Crystal Roberson and Stacy Gibson, Appellant's mothers, hosted a bachelorette block party on the 7300 block of Monticello Street to celebrate their upcoming marriage.  Dawn and Darnell Coats, who lived across the street, attended the party.  Once the party started quieting down late that evening, Ms. Coats went back to her house and sat

outside on the front porch with Mr. Coats and another neighbor, Nancy Stubbs. While they were on the porch, Hall visited the Coats' residence. The Coats knew Hall for several years and considered him a close friend. Hall regularly visited the Coats at their home.

A fight broke out across the street from the Coats' residence. Ms. Coats heard Gibson and her niece screaming. Gibson, who was intoxicated, sat down in the middle of the street and screamed that her party was ruined. Appellant and Gibson's daughter, Miraya Lucas, helped Gibson out of the road. Hall and his friends decided to leave after the fight broke out. Hall walked up to Gibson, and words were exchanged between Lucas, Appellant and Hall. Ms. Coats could not hear the conversation and did not see anyone pull out a gun. After about two minutes, Hall got into his car and drove away.

Later that evening, while Ms. Coats was speaking with a woman named Darneeka, Hall returned to the area. Gibson and Jasmine Bey ran off their porch and approached Ms. Coats, Hall and Darneeka in the middle of the street. Gibson was arguing with Hall. Mr. Coats heard the argument and joined the group of people outside. During the argument, Ms. Bey kept trying to walk behind Hall like she was trying to grab his gun. Hall then walked to his car with Ms. Coats where she watched Hall put something underneath the back seat of his car.

Hall walked back to the women standing in the middle of the street and apologized to Gibson for arguing with her, but Gibson continued to argue with Hall. Hall turned around to walk away from the group and toward the Coats'

house when three or four shots were fired in close succession. Hall fell to the ground and the women ran into their homes.

Maria Stewart, who had been visiting Ms. Coats, observed this altercation. Stewart saw a group of people, including Ms. Coats, arguing in the middle of the street. Stewart briefly approached the group before Ms. Coats told her to get back in her car, which she did. Stewart saw the people in the group arguing and shoving one another. Three of the women were physically aggressive with Hall, and Stewart believed they were pushing him. Hall did not push the women back or brandish a firearm.

During the argument, Stewart noticed a man over by the apartment buildings pacing back and forth. The man approached the street and stood approximately ten feet away from the group of people arguing when Stewart observed gunshots and flames or sparks from behind Hall. The man left through the walkway between the apartment building and the house next to it. Stewart testified that the man wore dark clothing, had brown skin, appeared to be average sized, and was around 5'9" or 5'10".

James Stubbs, a neighbor, witnessed the shooting from his apartment balcony. A loud argument caused Stubbs to wake up. He went onto his balcony to see what was happening and observed a group of people arguing in the middle of the street in front of Stubbs' building. Mr. Coats stood in between Gibson, Roberson and another woman. Hall stood behind Mr. Coats. Stubbs also observed a man dressed entirely in black approach the group from the pathway between his apartment building and Gibson's and Roberson's

house. The man extended his arm in a firing position, fired three shots, and ran away.

On July 15, 2019, Stewart spoke with homicide detectives. Detective McGee showed Stewart a photo array containing eight individual photos. Two photographs of men with very thick eyebrows, one of which was Appellant, caught Stewart's attention.

Two days later, while sitting on the porch at the Coats' house, Stewart saw a familiar man exit his car. Stewart recognized him as the man she saw standing on the sidewalk on the night of the shooting, and she learned that his name was Christian Bey (Appellant). Stewart went back to speak with detectives. She told Detective Magee she was sure that one of the individuals she previously identified in the photo array was the person she saw standing on the sidewalk on the night of the shooting, and that person was Appellant.

On July 16, 2019, Ms. Coats agreed to speak with homicide detectives, who showed her a video of a person walking up the hill on Hermitage Street. Ms. Coats identified the person as Appellant based on his face and his distinctive gait; his feet pointed to the left and right.

Meanwhile, on July 15, 2019, Officer Daniel Hartung, who was assigned to the Pittsburgh Police K-9 Unit, met with Detectives Cole, Ramey, and Fallert near the crime scene. Officer Hartung directed Edo, a City of Pittsburgh Police canine, to search the area. A few minutes later, Edo detected a firearm inside a detached garage on Fletcher Way, between the 7300 block of Monticello and Hermitage Streets. Sergeant Kelly Knerr recovered the firearm, a .45 caliber

- 4 -

Star pistol, from the detached garage, and found the pistol in a cocked position with one round in the chamber. The pistol had no serial number, because it had been damaged or obliterated.

Thomas Morgan, a scientist at the Allegheny County Medical Examiner's Office in the Firearm and Tool Marks Division, found that the pistol was operable and had a barrel length under fifteen inches. Morgan also tested three .45 caliber cartridge cases that were left at the scene and determined that they were discharged from this pistol.

Additionally, Morgan examined two firearms found in Hall's vehicle, a 9mm Smith & Wesson and a 357 Springfield Armory. Morgan determined that both were operable but opined that they could not have fired the .45 caliber shell casings and projectiles.

Appellant was charged with homicide and firearms offenses. His first trial ended in a mistrial,[1] and jury selection for a second trial began immediately. Maria Stewart testified during Appellant's first trial but failed to appear for his second trial. The court permitted the Commonwealth to read Stewart's testimony from Appellant's first trial into evidence. At the conclusion of the second trial, the jury found Appellant guilty of first-degree murder and several firearms offenses.

---

[1] It appears that the court granted a mistrial after a Commonwealth witness stated, without prompting by the prosecutor, that she was introduced to Appellant when he came home from prison.

On July 10, 2023, the court sentenced Appellant on the murder charge to life in prison without the possibility of parole plus a consecutive term of eight and a half to seventeen years' imprisonment on the firearms charges. Appellant filed a timely appeal to this Court, and both Appellant and the court complied with Pa.R.A.P. 1925.

Appellant raises the following issues in this appeal:

I. Did the Court violate the Best Evidence Rule, when it denied the Defense the opportunity to impeach with the use of Officer Szalla's Body Worn Camera (BWC) Footage, as to lighting; the Commonwealth offered "reportedly" still photos from an officer's BWC footage, in addition, the Commonwealth provided via Discovery, PDF versions instead of the actual digital photo with meta data. Counsel attempted to impeach with BWC video from which the still photo originated. Finally, the Court denied the use on cross for impeachment and said the Defense would have to wait to use BWC footage in its own case. As further prejudicial impact, the Court required the Defense to call Police witnesses and witnesses related to Decedent who were adverse, as their own witness on Direct examination. Further, the Defense was prevented from immediately impeaching witnesses with their recorded interviews because the Court ruled that if the police were part of Coates' interview and they hadn't testified yet, it was hearsay. See; Pa.R.E. 106; and The Best Evidence Rule Pa. R. Evid. 1002. Preserved Transcript-dated 3/21/23, Pg.105, Ln.1-Pg. 106, Ln.25 Tr. 3/21/23—Pg.110, LN.11-Pg.111, Ln.16 and Transcript dated 3/28/23, Pg. 779-98 Ln25, Tr. 3/30/23, Pg. 1170, Ln.2-Pg.1183, Ln.22., Tr. 3/22/23, Pg.66, Ln.12-Pg.70, Ln.9.

II. Did the trial court abuse its discretion when the Court granted the Commonwealth's request to deem Ms. Stewart, the only eyewitness, unavailable and to read her prior testimony into the record. The Commonwealth said it would not go forward without the decision, Counsel objected to the prejudice of the process, created by the Commonwealth's late notice. The Defense agreed after the mistrial to immediately pick a new jury, Maria Stewart had just testified and had they been informed about her refusal,

- 6 -

Counsel would have taken time before agreeing to immediately pick a new jury. Counsel was not told about Ms. Stewart's refusal until the first day of the second trial even though the Commonwealth knew the witness had refused on 3/15/23, and the selection of the new jury was completed, 3/21/23. The Court announced that it wouldn't provide a continuation to locate the witness, more than likely because a jury had already been selected. Moreover, the Commonwealth said that its case would take at least 2 weeks. Because the Court said it was inclined to grant the Commonwealth's request, the Defense asked the Court to delay ruling her unavailable, to allow more time to locate this critical witness, even adding it would send its own detective, while allowing the Commonwealth to begin its case but the request was denied. This witness's identity was sealed until approximately one month before the first trial and Counsel had limited time to vet her story. Transcript 3/21/23 Pg.4,Ln.7-Pg.12 Ln.25.

III. Did the court abuse his discretion when he released the Commonwealth's Ballistic Expert, he was now working in Ohio, against Defense's objection; the Court denied Counsel's request to keep the Expert subject to recall. On cross it was elicited the Expert had pictures of the purported match, (not provided in Discovery), that was validated by a supervisor in Allegheny County. None of this was in the report. Counsel wanted opportunity to review pictures before questioning the expert in their own case. Tr. Dated 3/28/23, Pg.910 Ln 25-Pg. 920 Ln 16, Pg.939,Ln.19-Pg.943, Ln.8.

IV. Did the trial court abuse discretion when it created obstacles for the Defense in its attempt to demonstrate bias and to show a rush to judgement as to the Pittsburgh Police investigation into the death of one of their own an off-duty officer. One potential witness was interviewed by the police, provided information beneficial to the defense but no follow up; Amber Walker who didn't know Appellant or his family, described a situation that bolstered the Defense theory, she provided an interview about a man with a gun that defense believed matched the description of Decedent Had her statement been confirmed, it would have rebutted the Commonwealth's theory. The Commonwealth put on witnesses Dawn Coates and Ofc. Szalla to bolster the claim that Decedent's gun was not in his holster and was stored in the officer's car in the rear pouch behind the front passenger seat. Detectives hadn't follow-up with Amber Walker and the Court throughout the case prevented questions put to Detectives about

the lack of follow up which was prejudicial to Appellant's defense. Tr. 3/29/23, Pg.1012, Ln.19-Pg.1016, Ln.19. In addition, the Court continuously interfered with the Defense asking questions about Pittsburgh Police written policy regarding conflicts of interests and biases. When a few questions were allowed after numerous side bars, the Court telegraphed its reluctance to find it relevant to police witnesses. The Defense repeatedly tried to demonstrate the Pittsburgh Police violated their own rules and regulations within the investigation, however the Court created cover for officers, allowing them to feign ignorance about what counsel was asking or their knowledge (Tr. dated 4/5/23,Pg. 1813, Ln.20-Pg, 1816,Ln.19). Although not in evidence, Counsel herself was a Pittsburgh Police sergeant for 15 years. With respect to the rule that officers shall not respond to calls involving family or defend the disputes of family members, the Court said it didn't understand what was being asked and was not satisfied that anyone was fighting and therefore irrelevant. Maria Stewart testified to the ladies, Bey, Gibson, Robeson and Dawn Coates shoving each other, further Coates testified that she believed Jasmine Bey was attempting to grab Decedent's gun. Further, Coates testified that Decedent responded to the call about a another man pulling a gun on her husband Darnel Coates who had self-reported being the decedent's cousin. In addition, the Court obstructed the Defense's attempt to show bias such as the use of the Pittsburgh Chief of Police's Press release, just one day later, characterizing the Decedent as "acting under the color of law." The press release was posted on the Bureau of Police website. Finally, the Court obstructed many questions. We believe the Court to be exhibiting Confirmation Bias. For example, while attempting to demonstrate the weakness of Probabilistic Genotyping, while questioning the DNA expert on a known notable scientific article she was aware of, the Court kept interrupting. Tr. Dated 4/5/23 Pg.1809 Ln.11-Pg. 1816 Ln. 19.

V. Did the trial court abuse its discretion when it refused to allow the Defense to offer the Commonwealth Medical Examiner's report into evidence in its own case, in the report, the ME admitted he could not conclude the order of two shots and couldn't opine on entrance and exit wounds on two wounds; the expert was called by the Commonwealth but changed his written opinion materially by combining a ShotSpotter report not authored by an expert, as part of his analysis without the Defense having notice to the change prior to his testimony, Pa.R.E. 705; the Defense questioned the expert on his changed opinion. The Expert was

released without the report being offered by the Commonwealth. When the Defense sought to enter the report, the Court denied the request and said that the report was hearsay. Tr. date 3/21/23, Pg.223 Ln.23- Pg.224 Ln.21. Tr. dated 4/4/23 Pg.1530 Ln.9-Pg.1545, Ln. 22.

VI. Did the trial court create an unfair advantage for the Commonwealth, when it deemed various crime scene conversations captured on an Officer's BWC footage initially inadmissible, even when the officers were available in court, the conversations were by the police that were on the scene prior to the Homicide detectives arrival, and recorded the unlikely credibility of Decedent's "gun placement," and questioned Decedent's family witnesses involvement in gun placement, and suggested the possibility of gang activity; these conversations were made by zone officers, some as high ranking as a Commander and an Assistant Chief. Then Court did eventually allow some questions in the Defense's case but forced Counsel to ask questions, in their part of the case, and treat the police as if Counsel was on direct. (Tr. 4/4/23,Pg. 1643, Ln.12-Pg.1648, Ln.19).

VII. Whether the trial court erred in allowing the Commonwealth to present a video of Appellant's mothers alone in an interrogation room, to rebut the testimony of Appellant's biological mother, Crystal Robeson, who in her own interview told police she was not present during the shooting but testified that she was present at trial. Tr. 4/11/23, pg. 2114, Ln. 18-Pg. 2118, Ln.3., Tr. 4/11/23, pg. 2138, ln.5, Pg. 2140, Ln. 17, Tr. 4/12/23, Pg.2272,Ln.23-Pg.2273,Ln.16., Tr. 4/12/23, Pg.2275,Ln.20-Pg. 11

VIII. Whether the trial court abused its discretion or erred as a matter of law allowing the Commonwealth on at least 2 occasions to use an unofficial transcript dictated from the audio of BWC of Appellant being interviewed, where at least 2 times, one during deliberations, the Commonwealth failed to redact references to Defendant's parole, prison term and not being allowed to own guns. Each member of the Jury was given the transcript to read along. Tr. 3/29/23. Pg.978.Ln.13-Pg.984,Ln.2., Tr. 4/12/23,Pg. 2277,Ln.8-Pg.2280,Ln. 6.

Appellant's Brief at 2-11.[2]

Appellant first argues that the Commonwealth failed to authenticate still photographs taken from a body worn camera ("BWC") worn by Officer Philip Szalla, an officer who arrived at the crime scene shortly after the shooting. The admission of evidence is within the discretion of the trial court, and we review its evidentiary rulings for abuse of discretion. ***Commonwealth v. Walters***, 323 A.3d 151, 157 (Pa. 2024).

Officer Szalla testified that around 12:30 a.m. on July 14, 2019, he responded to a call involving a man waving a firearm on the 7300 block of Monticello Street. Officer Szalla did not respond to that immediate location but instead began looking for a motorcycle that allegedly was involved in the incident and then left the scene. Officer Szalla located the motorcycle and conducted a traffic stop. He instructed the male and female on the motorcycle to step off the motorcycle, patted down the male for weapons, and recovered a firearm. While processing the motorcycle for towing, he heard three gunshots in his immediate vicinity. Shortly thereafter, he received a Shot Spotter alert for 7331 Monticello Street, about two blocks away, where Hall had been shot. The officer proceeded to Monticello Street and arrived there about one minute later.

---

[2] Although Appellant's Statement of Questions is prolix and awkwardly phrased, we do not find that it impedes appellate review. Appellant impermissibly has mixed multiple issues in each question presented and has included argument in the issues presented. ***See*** Pa.R.A.P. 2116(a).

During Officer Szalla's direct testimony, the Commonwealth introduced still photographs of Monticello Street obtained from Officer Szalla's BWC. Appellant argues that Officer Szalla could not authenticate these photographs because he did not participate in the conversion of BWC footage into still photographs. We disagree.

The Rules of Evidence provide, "Unless stipulated, to satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Pa.R.E. 901(a). The proponent may establish this requirement through, *inter alia*, the testimony of a witness with knowledge "that the item is what it is claimed to be." Pa.R.E. 901(b)(1). Arguably, Appellant waived this argument because his brief fails to identify the still photograph to which he objects. Assuming Appellant preserved this issue, Officer Szalla had personal knowledge of the scenes depicted in the still images and testified that the images accurately represented his observations. *See* N.T. 104, 107, 118.

Appellant contends that Officer Szalla could not authenticate the still photographs because he did not participate in the process to convert his BWC video into still images. Appellant suggests that some other person who had custody over the BWC after Officer Szalla might have tampered with the BWC's content while creating the still photographs. Under Rule 901, it is irrelevant that Officer Szalla played no part in converting the BWC into still photos. Since

he testified that he was present at the locations depicted in the images, he was authorized to authenticate these images under Rule 901(b)(1) based on his independent knowledge and recollection of those locations. Appellant's suggestion of tampering goes to the weight of this evidence, not its admissibility. *See Commonwealth v. Soto*, 202 A.3d 80, 102 (Pa. Super. 2018) (Commonwealth produced photograph of contraband taken shortly after defendant's arrest and elicited testimony that bag containing the contraband was sealed and received by police laboratory with seal intact; although defendant raised chain of custody objection by suggesting that police officer could have tampered with the contraband after defendant's arrest, these allegations went to weight of evidence rather than its admissibility).

Next, Appellant argues that the admission of still photos from Officer Szalla's BWC and the use of crime scene photos, which the Commonwealth provided before trial to the defense in PDF format, violated the best evidence rule. The Rules of Evidence define the best evidence rule as follows, "An original writing, recording or photograph is required in order to prove its content unless these rules, other rules prescribed by the Supreme Court, or a statute provides otherwise." Pa.R.E. 1002. "A duplicate is admissible to the same extent as the original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate." Pa.R.E. 1003. These rules apply to surveillance videos because they "present the same type of circumstances which the best evidence rule

was designed to guard against, namely testimony about the content of a videotape when the original tape has not been produced or admitted." ***Commonwealth v. Green***, 162 A.3d 509, 518 (Pa. Super. 2017). The Rules also provide, however,

> An original is not required and other evidence of the content of a writing, recording, or photograph is admissible if
>
> (a) all the originals are lost or destroyed, and not by the proponent acting in bad faith;
>
> (b) an original cannot be obtained by any available judicial process;
>
> (c) the party against whom the original would be offered had control of the original; was at that time put on notice, by pleadings or otherwise, that the original would be a subject of proof at the trial or hearing; and fails to produce it at the trial or hearing; or
>
> (d) the writing, recording, or photograph is not closely related to a controlling issue.

Pa.R.E. 1004.

Once again, Appellant arguably has waived this argument by failing to specify the images taken from Officer Szalla's BWC to which he objects. We assume, as does the Commonwealth, that the images at issue are the three still images the Commonwealth admitted through Officer Szalla as Commonwealth's Exhibits 2, 3, and 6.

The Commonwealth correctly argues that these exhibits do not violate the best evidence rule because they are not closely related to a controlling issue. ***Compare Commonwealth v. Talley***, 265 A.3d 485, 533-34 (Pa. 2021) (best evidence rule applied to screenshots of threatening text messages

- 13 -

sent by defendant to victim, where texts were critical to establishing the *actus reus* of stalking and terroristic threats).

Exhibits 2 and 3 depict the motorcycle stop that took place shortly before the shooting on a different street. The Commonwealth introduced these photographs merely to demonstrate Officer Szalla's course of conduct on the night in question. Thus, unlike the evidence in **Talley**, these photographs are not closely related to a controlling issue in this case.

Exhibit 6 depicts the scene of the shooting. Officer Szalla testified that the photo accurately represented what he observed when he arrived at the 7300 block of Monticello Street—Hall was lying on the ground with a male and female nearby. Officer Szalla described their demeanor as "hysterical, very upset, [and] yelling for help." N.T. at 120. Appellant contends that the best evidence rule applies to this image because lighting was a central issue in this case. **See** Appellant's Brief at 20-21 ("lighting was one of the core issues because the shooting took place at 1:34 AM, on a dark street . . . and the Commonwealth had only one eyewitness, [] Stewart, who was said to have made the identification. This witness did not know [Appellant] and had never seen him before that night"). The Commonwealth, however, did not introduce this exhibit to demonstrate the lighting at the scene. It only introduced this exhibit to show what Officer Szalla observed when he arrived at the scene. Furthermore, neither the Appellant nor the eyewitness, Stewart, appeared in the photograph. Appellant's brief does not discuss whether the

Commonwealth showed this photograph to Stewart during her testimony[3] or asked her whether it accurately depicted the lighting at the scene. Nor does Appellant provide any reason to believe that the photograph depicted the lighting inaccurately. Numerous witnesses testified, with personal knowledge, about the lighting at the crime scene. *See* N.T. at 122-23, 267, 273, 383-84, 386-87, 394, 400-02, 417, 474-75, 497, 529, 820, 1559, 1560-61, 1564-66, 1576-80, 1582-86, 1589-90, 1694-96, 1997. Appellant fails to demonstrate that the photograph materially contradicted the testimony of any of these witnesses. As important, the photograph does not depict the distance from which Stewart observed Appellant to assess what effect, if any, lighting may have had on her ability to observe the shooting. Finally, Appellant fails to demonstrate that the Commonwealth made any argument about the photograph that misled the jury about lighting. Thus, this photograph is not closely related to a controlling issue in this case.

Appellant also complains that the Commonwealth violated discovery rules because it provided Appellant with PDF copies of the photographs instead of "original copies" of the photographs, *i.e.*, the BWC along with its metadata.[4]

_____

[3] As discussed in depth below, Stewart only testified during Appellant's first trial. She did not testify during Appellant's second trial, and her testimony from Appellant's first trial was admitted into evidence.

[4] Black's Law Dictionary defines metadata as "secondary data that organize, manage, and facilitate the use and understanding of primary data." Black's Law Dictionary (12th ed. 2024). "Stated differently, a computer uses
*(Footnote Continued Next Page)*

He contends that the trial court abused its discretion by permitting the Commonwealth to introduce PDF copies of photos because they did not contain metadata. We disagree. Pennsylvania Rule of Criminal Procedure 573, which governs pretrial discovery, requires the Commonwealth to disclose, if requested and material to the case, "any tangible objects, including documents, photographs, fingerprints, or other tangible evidence[.]" Pa.R.Crim.P. 573(B)(1)(f). The purpose of this rule is to prevent trial by ambush by permitting parties to a criminal case to be prepared for trial. *Commonwealth v. Lynch*, 242 A.3d 339, 350 (Pa. Super. 2020) ("Rule 573 governs pretrial discovery and the purpose of it is to prevent trial by ambush"). The Commonwealth complied with Rule 573 by providing Appellant PDF copies of the crime scene photos. The prosecutor informed the court that her general practice was to provide photographs to defense counsel in PDF form to prevent alteration of the photos. The prosecutor simply changed the file type from its original version to a PDF version. She did not alter or enhance the photograph's content.

In any event, the Commonwealth *did* provide the requested metadata to Appellant. In the middle of trial, Appellant requested original copies of all 1,000 crime scene photos and associated metadata. The Commonwealth

_____

metadata to describe and present primary data. The primary data is the substantive content that is displayed in the body of the document. Unlike primary data, metadata is not viewable in the document's body." *Talley*, 265 A.3d at 504 n.6.

provided all requested materials, and Appellant employed a computer expert who reviewed and analyzed the metadata. The court repeatedly offered to send the jury home and go through each photograph one by one with counsel to ensure the original and PDF versions of the photos were the same. Defense counsel did not accept this offer and did not raise any issues with the metadata after the computer expert reviewed the photographs.

For these reasons, Appellant's argument concerning the best evidence rule is devoid of merit.

In his second argument, Appellant contends that the trial court abused its discretion in granting the Commonwealth's request to declare Maria Stewart unavailable and admitting her testimony from Appellant's first jury trial, because the Commonwealth failed to demonstrate a good faith effort to locate Stewart before the second trial. We disagree.

During Appellant's first trial, Stewart gave testimony that implicated Appellant as the murderer. On March 15, 2023, the court declared a mistrial. The parties began picking a new jury, and jury selection concluded on March 21, 2023.

On that date, the Commonwealth asked the trial court to declare Stewart unavailable. The prosecutor advised that on March 15, 2023, following the declaration of a mistrial, Stewart sent a text refusing to come to Appellant's second trial. Tr. at 8. She also quit her job, refused to respond to texts from police officers, and avoided service of a subpoena to testify. *Id.*

at 8-9.  Later that day, Detective Robert Provident testified about his attempts to procure Stewart's attendance for the second trial.  The detective stated that on March 15, 2023, after the trial court declared a mistrial, Stewart texted him, "I am done. I am not fucking coming back in.  Thank you."  *Id.* at 166.  Following this text, the detective made numerous attempts to serve her a subpoena for the rescheduled trial date.  He attempted to contact Stewart "[e]very single day, morning, evening," and other officers also attempted to contact her.  *Id.* at 167.  He emailed Stewart a copy of the subpoena, which she deleted.  *Id.* at 167-68.  He left a subpoena in Stewart's mailbox, which is how he previously served her before her testimony at Appellant's first trial.  *Id.* at 166-67.  He texted Stewart, informing her that the subpoena was in her mailbox.  *Id.* at 167.  Stewart did not respond and deleted all messages between herself and the detective.  *Id.*

Detective Provident also contacted all of Stewart's known employers.  *Id.*  One employer informed him that she quit her job on the date of the mistrial.  *Id.*  After a bench warrant was issued, the detective contacted Stewart's son, who indicated that he would attempt to bring Stewart to court.  *Id.* at 442-43.

On March 23, 2023, when Stewart continued to fail to appear for court, the Commonwealth requested that Stewart be declared unavailable and that her prior testimony be read into evidence.  *Id.* at 443.  The trial court held that Stewart was unavailable despite the Commonwealth's good faith efforts

to locate her, and Stewart's testimony from Appellant's first trial was read into evidence. *Id.* at 451.

The court's decision was proper under 42 Pa.C.S.A. § 5917, which provides in relevant part:

> Whenever any person has been examined as a witness, either for the Commonwealth or for the defense, in any criminal proceeding conducted in or before a court of record, and the defendant has been present and has had an opportunity to examine or cross-examine, if such witness afterwards dies, or is out of the jurisdiction so that he cannot be effectively served with a subpoena, or if he cannot be found, or if he becomes incompetent to testify for any legally sufficient reason properly proven, notes of his examination shall be competent evidence upon a subsequent trial of the same criminal issue.

*Id.*

Under Section 5917, "[p]rior sworn testimony of a witness is admissible in a later proceeding where the witness is unavailable and the defense has been provided a full opportunity for cross examination." *Commonwealth v. Wayne*, 553 Pa. 614, 720 A.2d 456, 465-66 (Pa. 1998). "[A] witness is unavailable if the prosecution has made a good faith effort to introduce its evidence through the live testimony of the witness, and through no fault of its own, is prevented from doing so." *Commonwealth v. Melson*, 637 A.2d 633, 637 (Pa. Super. 1994). It is within the trial court's discretion to determine what constitutes a good faith effort to locate a missing witness, and we will not overturn the court's decision absent an abuse of discretion. *Commonwealth v. Lebo*, 795 A.2d 987, 990 (Pa. Super. 2002).

The relevant caselaw provides detailed examples of when the Commonwealth has made good faith efforts to procure missing witnesses and when it has not. In **Commonwealth v. Blair**, 460 Pa. 31, 331 A.2d 213 (Pa. 1975), the defendant's first murder trial ended in a mistrial when the jury was unable to arrive at a verdict. During jury selection for his second trial, one of the Commonwealth's key witnesses, the defendant's girlfriend, informed a detective that she would not appear. The trial court permitted the witness's testimony from the defendant's first trial to be read to the jury. Our Supreme Court held that the trial court's decision was a proper exercise of discretion under 19 P.S. § 582, the predecessor statute to Section 5917.[5] During the defendant's second trial, detectives attempted to locate the girlfriend by going to her home, which was abandoned, speaking with her mother as well as her stepbrother, and maintaining an all-night vigil at the witness's home. The Court reasoned, "Although the district attorney would have been better advised not to wait until appellant's trial began to attempt to secure the attendance of the witness, we cannot conclude that his delay vitiated the extensive efforts to find the witness." **Id.** at 215. The Commonwealth was not required to "establish that the witness has disappeared from the face of the earth." **Id.** All that the Commonwealth must do is "make a good-faith effort to locate the witness and fail." **Id.** The evidence of record was sufficient

_____

[5] 19 P.S. § 582 was reenacted in 1976 as 42 Pa.C.S.A. § 5917.

to establish that the Commonwealth made a good faith attempt to locate the witness. *Id.*

Similarly, in **Commonwealth v. Douglas**, 558 Pa. 412, 737 A.2d 1188 (1999), the Court held that the Commonwealth made a good faith effort to find a witness based on the testimony of several police officers who testified to various measures they undertook, including repeatedly searching at his apartment, at his mother's apartment, at a number of bars he was known to frequent, at his girlfriend's house, and elsewhere, and also contacted his mother, his sister, his girlfriend, his neighbors, the security officers at the housing project, and others in an effort to find him.

In contrast, in **Lebo**, one of the key witnesses was a female whom the defendant had allegedly photographed in the nude while she was a minor. On the day of trial, the Commonwealth stated that it had learned two days earlier that the witness was in boot camp and would not be available for trial because she had two more weeks of training. The Commonwealth did not provide any information concerning whether it had subpoenaed the witness. This Court held that the Commonwealth failed to make a good faith attempt to establish the witness's unavailability, and that the trial court erred in permitting the Commonwealth to introduce her preliminary hearing testimony. *Id.*, 795 A.2d at 990-91; *see also Commonwealth v. Faison*, 452 Pa. 137, 305 A.2d 44, 47 (1973) (prosecution failed to make good faith effort to establish witness's unavailability when it knew where witness resided and made no attempt to

secure compulsory attendance at hearing other than unsuccessful phone calls).

This is not a case where the Commonwealth only made half-hearted attempts before trial to contact a witness (***Faison***) or no effort at all (***Lebo***). Instead, as in ***Blair*** and ***Douglas***, the Commonwealth made a good faith effort to locate Stewart after she informed the detective that she would not testify during Appellant's second trial. Following Stewart's text on March 15, 2023, refusing to appear for the second trial, the detective and other officers attempted to serve Stewart in person with a subpoena every day between March 15 and March 21, 2023. Detective Provident also left a subpoena in Stewart's mailbox, texted her that the subpoena was in her mailbox, and emailed her a copy of the subpoena. The detective also contacted all of Stewart's known employers and her son in attempts to obtain her attendance.

Appellant complains that the Commonwealth should have immediately informed him on March 15, 2023, the date the first trial ended in a mistrial, about Stewart's text refusing to appear for Appellant's second trial. Appellant argues that the failure to inform him constituted prejudicial "gamesmanship" because he agreed on March 15th to pick a new jury and proceed immediately to a second trial but would not have done so had he known about Stewart's text. This argument rests on the assumption that Detective Provident received Stewart's text *before* Appellant agreed to pick a new jury. Appellant, however, fails to provide a record citation that establishes the detective received the

text before Appellant agreed to pick a new jury; nor can we find any such evidence in the record. Furthermore, and more importantly, we consider this argument irrelevant. The test for unavailability is whether the Commonwealth makes a good faith effort to procure an absent witness's testimony. **Melson**, 637 A.2d at 637. Evidence of when the Commonwealth informs the defendant that a witness refuses to appear is immaterial to whether the Commonwealth has made sufficient effort to secure the witness's testimony.

We also conclude that Appellant had a full and fair opportunity to cross-examine Stewart at his first trial, thus satisfying the second part of Section 5719, that the defense had a full and fair opportunity for cross examination of an unavailable witness.

Appellant concedes that Stewart was "vigorously cross-examined," Appellant's Brief at 28, but argues that he was deprived of vital impeachment evidence during her cross examination. Appellant's argument implicates his rights to confront witnesses against him. "[W]hether Appellant's confrontation rights were violated is a question of law, thus our standard of review is *de novo* and our scope of review is plenary." **Commonwealth v. Leaner**, 202 A.3d 749, 775 (Pa. Super. 2019). When the Commonwealth seeks to introduce a witness's prior testimony, the defendant is denied a full and fair opportunity to cross-examine the witness "where the defendant is denied access to vital impeachment evidence at or before the time of the prior

proceeding at which that witness testified." **Wayne**, 720 A.2d at 466 (internal citations omitted).

Appellant claims he was unaware of Stewart's existence until shortly before trial, the trial court prevented him from impeaching her with her police interview, and the Commonwealth provided PDF copies of photographs instead of the original copies, including their embedded metadata. None of these claims are correct. Our review of the record indicates the Commonwealth provided Stewart's identity and the recording of her police interview prior to Appellant's first trial.

Although Appellant did not receive copies of the original photographs and their metadata until the middle of the second trial, he fails to establish that these documents constitute vital impeachment evidence. Appellant contends that the metadata "would reveal whether the picture's lighting was altered" and was critical to her identification of Appellant. Appellant's Brief at 28. During the first trial, however, Appellant had the opportunity to question Stewart about what she saw on the night of the incident, the identity of the person involved, and the circumstances surrounding her interviews with police. He fails to provide any specific example in his brief that the metadata materially contradicted Stewart's testimony. Absent such a showing, we conclude that the metadate did not constitute vital impeachment evidence.

For these reasons, the court properly permitted the Commonwealth to submit Stewart's testimony from the first trial into evidence.

Appellant next argues that the trial court abused its discretion when it refused to continue the subpoena of Thomas Morgan, who testified for the Commonwealth as an expert in firearms examination. Appellant wanted to recall Morgan in his own case-in-chief to question him about photographs which were not provided to the defense in pretrial discovery. We conclude that the trial court properly exercised its discretion because Appellant failed to show that Morgan had information favorable to the defense.

Morgan, while previously employed at the Allegheny County Medical Examiner's Office as a Scientist in the Firearm and Tool Marks Division, examined a 45-caliber pistol, three cartridges, and an empty firearm magazine. Tr. at 853-54, 856, 858. On cross, Morgan testified that he used photographs in his notes, but not in his report. *Id.* at 888. He stated these types of photographs routinely were taken as part of his examination and were shown to other scientists in the lab as a means of peer review. *Id.* at 887-89, 909-10. The photos usually were not included in expert reports but were available upon request. *Id.* at 887-88, 910.

At the conclusion of Morgan's cross examination, defense counsel requested copies of the photographs used in Morgan's notes. *Id.* at 911-12. Defense counsel also requested more time to look at the photographs and have an expert review them. *Id.* at 914-20, 940-41. The court denied this request because the defense did not have its own firearms and toolmarks expert. *Id.* at 917.

The Commonwealth recalled Morgan and introduced the photographs Morgan took as part of his examination as exhibits. *Id.* at 924-25. The court admitted the photographs into evidence over defense counsel's objection. *Id.* at 925.

After Morgan's direct and cross examination regarding the photographs, defense counsel requested that Morgan not be released from his subpoena and remain subject to recall in Appellant's case-in-chief. *Id.* at 939-40. The trial court released Morgan from the Commonwealth's subpoena and told the defense to request an out-of-state subpoena if it wished to call Morgan. *Id.* at 943-44.

A criminal defendant has a right of compulsory process to obtain witnesses in his favor under both the Pennsylvania and United States Constitutions:

> The right to compulsory process encompasses the right to meet the prosecution's case with the aid of witnesses, and the right to elicit the aid of the Commonwealth in securing those witnesses at trial, both of which are fundamental to a fair trial. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law. The constitutional right, though fundamental, is not, however, absolute. In order to compel the attendance of a witness at trial, it must be shown that the information possessed by the witness is material, *i.e.*, capable of affecting the outcome of the trial, and that it is favorable to the defense.

*Commonwealth v. McKenzie*, 581 A.2d 655, 657 (Pa. Super. 1990) (internal citations and quotations omitted). The defendant has the right of

compulsory process to obtain witnesses in his favor. ***Commonwealth v. Lahoud***, 488 A.2d 307, 310 (Pa. Super. 1985).

This right, however, is not violated "merely because a witness in a criminal case leaves the jurisdiction or is otherwise unavailable." ***Id.*** The court has the discretion to deny a motion to secure a witness's testimony when no basis exists to believe that his testimony would be favorable to the defense. ***Id.*** at 310-11.

Appellant's argument fails because he fails to describe how Morgan's testimony would have been favorable to him. To the contrary, Morgan's testimony was unfavorable to Appellant because Morgan gave expert testimony that (1) the pistol found near the scene was operable and had a barrel length under fifteen inches; (2) three .45 caliber cartridge cases recovered at the scene were discharged from this pistol; and (3) two other firearms found in Hall's vehicle could not have fired the .45 caliber shell casings and projectiles. Thus, we conclude that the trial court's decision to release Morgan from his subpoena was not an abuse of discretion.[6]

---

[6] Furthermore, Appellant waived two components of the argument in his brief relating to Morgan. Appellant waived his claim that Morgan failed to disclose the facts he used to form his opinion pursuant to Pa.R.E. 705 and that the Commonwealth violated Pa.R.Crim.P. 573 by failing to disclose Morgan's notes, because he did not include these arguments in his statement of errors complained of on appeal. ***See*** Pa.R.A.P. 1925(b)(4)(vii) ("issues not raised in the Statement [of matters complained of on appeal] are waived").

- 27 -

In his next argument, Appellant contends that the trial court abused its discretion by "creating obstacles" that prevented defense counsel from asserting its theory of the case. Appellant's Brief at 33-34. Appellant claims he was unable to question officers about their lack of follow up with a non-testifying witness, Amber Walker, *id.* at 34-35, he could not question officers about various Pittsburgh Police Department policies, *id.* at 35-36, could not use a press release from the Pittsburgh Bureau of Police to show confirmation bias, *id.* at 36, was prevented from impeaching officers with conversations captured on body worn camera from the scene of the crime, *id.*, and was prohibited from asking a DNA analyst testifying for the Commonwealth about a scientific article, *id.* at 37.

Appellant waived his argument that he was unable to question officers about their lack of follow up with Walker because he did not include this claim in his statement of errors complained of on appeal. *See* Pa.R.A.P. 1925(b)(4)(vii).

We also conclude the trial court acted within its discretion when it prohibited Appellant from eliciting testimony concerning alleged police policies. Appellant called Detective Provident in his case-in-chief and asked the following on direct examination:

> Q. [Ms. Robinson]: Detective, as a rule, does the department frown upon Officers being involved in fights involving their own family and friends?
>
> Ms. Ramaley: Objection.

Ms. Robinson: Your Honor, that has been the narrative from the beginning. It's relevant.

The Court: There [is no] evidence that a City of Pittsburgh Police Officer or any other Police Officer being involved in a fight with friends and/or family. Sustain the objection. You may ask another question, please.

Tr. at 1809. At side bar, Appellant argued the question was relevant to show that Hall violated a police policy that prevents officers from participating in disputes that could be considered a conflict of interest when he attempted to stop a heated argument between a group of people, including his friends, the Coats.

The court properly sustained the objection due to lack of relevance, since Appellant failed to identify any written police policy on point or explain how violation of the alleged policy pertained to his theory that the Pittsburgh Police were biased in their investigation of Hall's murder.

The trial court also acted within its discretion by prohibiting Appellant from questioning officers about a press release from Pittsburgh Bureau of Police Chief Scott Schubert wherein he stated Hall was "acting under the color of the law" while attempting to break up a fight. On cross-examination, Appellant asked Detective Provident whether he recalled a press release authored by Chief Schubert. The Commonwealth objected to the question as irrelevant and outside the scope of his direct examination, and the court sustained the objection. *Id.* at 616. Appellant fails to demonstrate how the press release is relevant to his theory that the Pittsburgh Police were biased in their investigation of Hall's murder. Chief Schubert was not on the scene

of the crime and did not testify at trial, so his press release is inadmissible hearsay. *See* Pa.R.E. 801, 802. Moreover, it is unclear whether Detective Provident or any other testifying officer had independent knowledge of the press release. Finally, Chief Schubert's belief that Mr. Hall was "acting under the color of law" prior to his murder was beyond the scope of the Commonwealth's direct examination and is irrelevant to the investigation into his death.

Nor did the trial court abuse its discretion in requiring Appellant to call officers in his case-in-chief to ask questions about their conversations at the crime scene. Appellant complains that he had to elicit this testimony in his own case on direct examination rather than in the Commonwealth's case on cross-examination. Appellant fails to explain how he suffered prejudice from the court's ruling that he had to obtain this testimony in his own case.

Next, Appellant claims that the court erred by prohibiting him from cross examining Jennifer Bracamonte, a DNA analyst at Cybergenetics, with "a known notable scientific article." Appellant's Brief at 37. The Commonwealth correctly points out that Appellant waived this argument by failing to develop it in his brief or cite any legal authority in support of this argument. *Commonwealth v. Wright*, 314 A.3d 515, 523 (Pa. Super. 2024) ("[W]here an appellant fails to provide any discussion of his issue on appeal, or case law supporting his right to relief, this Court will not address the issue on appeal").

In his next argument, Appellant claims that the trial court abused its discretion when it did not allow him to introduce Dr. William Ennis's autopsy report in his case-in-chief. He also argues the trial court abused its discretion when it permitted Dr. Ennis to change his expert opinion from the opinion written in his autopsy report based on subsequently acquired information from a Shot Spotter report. We conclude that Appellant waived this argument.

The Commonwealth questioned Dr. Ennis about his autopsy findings but did not seek to admit his autopsy report as an exhibit. Dr. Ennis discovered three entrance wounds and one exit wound during the autopsy, and he recovered two bullets lodged inside Hall's body. Tr. at 198-99. In his written report, Dr. Ennis could not differentiate between one of the entrance and exit wounds. *Id.* at 200-01. Subsequently, Dr. Ennis became aware of a Shot Spotter report, admitted as a Commonwealth exhibit, and learned that three shots were fired in rapid succession. *Id.* at 201. This report allowed Dr. Ennis to determine which of Hall's wounds were entrance or exit wounds. *Id.* at 201-02.

Appellant did not call Dr. Ennis in his case-in-chief and did not attempt to admit the autopsy report into evidence through any witness. Several days after Dr. Ennis testified, defense counsel informed the trial court at sidebar that Appellant wanted to admit Dr. Ennis's report as a defense exhibit. During the same sidebar conference, defense counsel moved, for the first time, to strike Dr. Ennis's testimony concerning the Shot Spotter report on the ground that this testimony was a material departure from his written report. The trial

court denied Appellant's motion to strike Dr. Ennis's testimony concerning the Shot Spotter report. The court did not rule on counsel's request to introduce Dr. Ennis's report in his case-in-chief. Nor did counsel inform the court that it failed to rule on his request to admit Dr. Ennis's report. Tr. 1912-14.

We agree with the Commonwealth that Appellant waived his objection to the failure to admit Dr. Ennis's report. "It is well settled that, in order to preserve an issue on appeal, a party must lodge a timely objection." **_Commonwealth v. Gonzalez_**, 112 A.3d 1232, 1240 (Pa. Super. 2015). Appellant did not attempt to admit it in the proper manner. Nor did Appellant attempt to admit the report through any of his witnesses, including Dr. Ennis who authored the report, and the report is not self-authenticating. Pa.R.E. 902. Although Appellant's counsel told the trial court several days after Dr. Ennis testified that Appellant wanted to introduce the report, the court did not rule on this request, and Appellant did not follow up with another request.

We also agree with the Commonwealth that Appellant waived his request to strike Dr. Ennis's testimony concerning the Shot Spotter report, because Appellant failed to object to this testimony until several days after Dr. Ennis left the stand. **_See Gonzalez_**, 112 A.3d at 1240 (timely objection is necessary to preserve issue for appeal).

Appellant also argues that the trial court abused its discretion when it did not allow him to introduce an expert report from Frederick Fochtman, Ph.D. Appellant has waived this argument. It is well settled that issues not raised in a Rule 1925 statement of matters complained of on appeal are

waived. ***Commonwealth v. Hill***, 16 A.3d 484, 494 (Pa. 2011). Appellate courts may raise such waivers *sua sponte*. ***Id.*** Since Appellant's statement of matters complained of on appeal does not raise this issue, it is waived.

Continuing, Appellant argues the trial court abused its discretion when it permitted the Commonwealth to present a video of Crystal Roberson's police interview. Appellant claims the Commonwealth introduced the video for the purpose of injecting Stacy Gibson's inadmissible hearsay statements made to Roberson while both women were in a police interview room. We disagree. The Commonwealth properly introduced the video to impeach Roberson's testimony that she never spoke with the police about the events on the night of the shooting.

Roberson and her fiancée, Gibson, hosted the block party to celebrate their upcoming wedding. Roberson testified that she and Gibson were "very drunk" at the party. Tr. at 2053, 2072. Roberson testified that she was outside later in the evening when shots were fired. ***Id.*** at 2055-56. She explained that while everyone was in the street arguing, Hall arrived and joined the argument. ***Id.*** at 2058-60. She stated that everyone in the street was physically fighting until shots were fired. ***Id.*** at 2059-60. The police later escorted Roberson to the station to be interviewed. ***Id.*** at 2064, 2076. On direct examination, Roberson stated she did not tell detectives anything:

> Q [Defense counsel]: Did you tell the Detectives anything about what happened?
>
> A [Roberson]: No, I did not.

Q. Is there a reason why you didn't tell them?

A. Because I didn't know.

Q. If you knew, would you talk to them?

A. No, I wouldn't tell them.

Q. Why wouldn't you talk to them?

A. I live in Homewood. People kill for doing things like that.

*Id.* at 2067-68.

On cross-examination, the Commonwealth confronted Roberson with her prior inconsistent statements:

Q. [The Commonwealth]: Okay. Well, you testified on direct you didn't talk to Police, right?

A. [Roberson]: I didn't say anything to them.

Q. No. You told them you were outside, correct?

A. No. I never said that.

Q. Oh. You didn't tell the Police that you were inside washing dishes and cleaning when you heard shots fired?

A. No. I didn't say that. I did not say that.

Q. So you didn't say you were in the house when the shots were fired; is that correct?

A. I did not say that.

Q. Okay. And then at some point you changed your story and said you were taking your sister to a jitney or something and that you heard shots when you were walking home? Did you say that?

A. I did not tell them that.

Q. Let me ask you this. Do you recall when Stacy Gibson was put in the interview room with you?

A. Uh-huh.

Q. Yeah. You guys were talking about the incident in there, too, weren't you?

A. No, we were not.

Q. You didn't tell her I was not running into the house when you were in that interview with her?

A. I did not.

Q. You didn't tell her I was not outside when you were in that interview room?

A. I did not.

Q. Did you hear her say that's because of your boy?

A. No, I did not.

Q. Okay. All right. So you're denying any of this conversation; is that correct?

A. Because it didn't happen.

*Id.* at 2076-78.

The Commonwealth called Detective Janine Triolo as a rebuttal witness.

*Id.* at 2127. Detectives Triolo and Nee interviewed Roberson at the Pittsburgh

Police Department in the early morning hours of July 14, 2019. *Id.* at 2127-

28. After they conducted the interview, Gibson was placed in the interview

room with Roberson. *Id.* at 2128-29. Roberson and Gibson were audio and

video recorded while in the room. *Id.* at 2129. The Commonwealth moved

to admit the video into evidence, which included Roberson's police interview

and a conversation between Roberson and Gibson in the interview room. The trial court admitted the video over defense counsel's objection. ***Id.*** at 2129-34.

> The Rules of Evidence provide:
>
> Unless the interests of justice otherwise require, extrinsic evidence of a witness's prior inconsistent statement is admissible only if, during the examination of the witness, (1) the statement, if written, is shown to, or if not written, its contents are disclosed to, the witness; (2) the witness is given an opportunity to explain or deny the making of the statement; and (3) an adverse party is given an opportunity to question the witness.

Pa.R.E. 613(b). The Commonwealth properly admitted the video as impeachment evidence under Rule 613(b). Roberson's testimony on direct examination that she did not talk to the police clearly contradicted the fact that she underwent a police interview. Roberson testified that she never had a conversation with Gibson about the shooting while in the interview room. That statement was false, because there is an audio and video recording Roberson speaking with Gibson about the shooting. Thus, the Commonwealth had the right to introduce the audio and video recording as a prior inconsistent statement.

In addition, the Commonwealth satisfied the three-part test for admission prescribed under Rule 613(b). An adverse party (Appellant) was given the opportunity to question Roberson. The Commonwealth disclosed the contents of her police interview to Roberson on cross-examination, and it

gave Roberson the opportunity to explain or deny the making of the statement.

Contrary to Appellant's claim, the video was not a "pretext to show damaging hearsay accusations," Appellant's Brief at 40, because the Commonwealth did not introduce it for the truth of the matter asserted. It was introduced as extrinsic impeachment evidence to show that Roberson was lying; she spoke to police and to Gibson about the shooting.[7]

For these reasons, the court acted within its discretion by admitting the video into evidence.

Next, Appellant argues that the trial court abused its discretion when it allowed the Commonwealth to show the jury an unofficial transcript of Appellant's police interrogation because they contained unredacted references to the fact that Appellant has been to prison, was on parole, and is unable to own guns. Counsel requested a mistrial, which the court denied. Tr. at 978-984.

_____

[7] We also note that the court instructed the jury not to consider the video for the truth of matters asserted in the video. The court charged that the jury could consider this evidence for "one purpose only. To help you judge the credibility and weight of the evidence and testimony given by [this witness] at trial. You may not regard evidence of an earlier inconsistent statement as proof of the truth of anything that was said in that statement." Tr. 2232-33. "Jurors are presumed to follow the trial court's instructions." *Commonwealth v. Tyson*, 119 A.3d 353, 360 (Pa. Super. 2015). There is no evidence the jury disregarded these instructions.

We assess the denial of a motion for a mistrial for abuse of discretion. ***Commonwealth v. Sanchez***, 907 A.2d 477, 491 (Pa. 2006). The trial court did not abuse its discretion.

To elaborate, the Commonwealth questioned Detective Fallert about Appellant's statements. Tr. at 970-73. The Commonwealth admitted, without objection, a video of Detective Fallert questioning Appellant during a traffic stop. *Id.* at 973-74. Further, the defense did not initially object to the jury's use of a transcript of the video for purposes of reading along. *Id.* at 974-75. The Commonwealth played parts of the video, but the trial court adjourned for the day before the entire video was played. *Id.* at 975-76. The next day, the Commonwealth continued playing the video and distributed transcripts for the jury to read along. *Id.* at 977. After the video was played, defense counsel requested a sidebar because Appellant stated at one point in the transcript, "I don't own guns. But I don't know what kind of gun it was. I am not allowed to be around their guns." *Id.* at 978. Counsel argued the jury should not have heard this statement and requested a mistrial.

The trial court did not abuse its discretion in denying the mistrial. Appellant's statement that he was not allowed to be around guns does not imply that he had prior criminal charges. As the Commonwealth pointed out, there were a number of noncriminal reasons why a person might not be allowed to be around guns. *Id.* at 979-80 (prosecutor's statement that

"maybe his mom won't let him have them in the house. Maybe he's not allowed to have them around his child. It could be a custody issue").

Next, Appellant claims the trial court abused its discretion when it allowed the Commonwealth, during jury deliberations, to provide the jurors with a transcript to read along as they rewatched video evidence of Appellant's interview. During deliberations, the jurors asked to rewatch Appellant's video interview and were provided with a transcript to read along. Tr. at 2273-77. Appellant did not object to the jury reading a transcript as they watched the video. The video was played for the jury in open court. When the jurors were on page 14 of the transcript, the video was paused when defense counsel realized that the transcript contained an unredacted reference on page 18 to Appellant being on probation. *Id.* at 2277-78. Each juror was colloquied to ensure they did not read ahead to the portion of the transcript discussing Appellant's probation. *Id.* at 2278-2295. Each juror stated that he or she had not read page 18 of the transcript. *Id.* After this colloquy, there was no further objection to the use of the transcript or a motion for mistrial. Since the record establishes that the jury did not see the reference to Appellant's probation in the transcript, the court's decision to allow the jury to read the transcript does not entitle Appellant to relief.

Finally, Appellant argues the trial judge exhibited the appearance of prejudice sufficient to warrant a new trial. We disagree.

The party requesting recusal bears the burden of producing evidence establishing bias or prejudice which raises a substantial doubt as to the jurist's ability to preside impartially. *In Re C.A.J.,* 319 A.3d 564, 570 (Pa. Super. 2024). In disposing of a recusal request,

> a jurist must first make a conscientious determination of his or her ability to assess the case before the court in an impartial manner, free of personal bias or interest in the outcome. "This is a personal and unreviewable decision that only the jurist can make." *Goodheart v. Casey*, 523 Pa. 188, 565 A.2d 757, 764 (1989). Once satisfied with that self-examination, the jurist must then consider whether or not continued involvement in the case would tend to undermine public confidence in the judiciary. *Id.* In reviewing a denial of a disqualification motion, we "recognize that our judges are honorable, fair and competent. Once the decision is made, it is final.... *Reilly by Reilly v. SEPTA*, 507 Pa. 204, 489 A.2d 1291, 1300 (1985).

*Commonwealth v. Traviglia*, 541 Pa. 108, 661 A.2d 352, 370 (1995).

At trial, against the advice of his attorneys, Appellant asked the trial judge to recuse himself. Tr. at 1506. The trial judge denied this motion. *Id.* at 1505-12. Appellant had no right to make this motion himself, because there is no right to hybrid representation at trial or on appeal. *Commonwealth v. Robinson*, 320 A.3d 732, 736 (Pa. Super. 2024). Since Appellant was represented by counsel during trial, the trial court properly denied his *pro se* motion.

For these reasons, we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


DATE:  12/22/2025